CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**OCT 27 2017**

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 7:16cr30026-13 |
| v. | MEMORANDUM OPINION |
| MICHAEL JONES, et al., | By: Michael F. Urbanski |
| Defendants. | Chief United States District Judge |

This matter comes before the court on defendant Jaymese Jones'[1] motion and supplemental motion to suppress statements she made to police following a traffic stop and investigation. ECF No. 560, 926. The government filed a response opposing the motion, ECF No. 907, and the court addressed the matter at a hearing held on October 17, 2017. For the reasons set forth below, the court denies Jaymese's motion to suppress.

I.

On September 16, 2016, Jaymese and a friend, Shonda Jones, were pulled over by police while they were driving on I-95 in Virginia. Following the stop, Jaymese made various statements to the police, but she was never informed of her rights under Miranda v. Arizona, 384 U.S. 436 (1966). Jaymese argues that the police took her into custody following the traffic stop, and that the failure of the police to advise her of her Miranda rights requires the suppression of her statements.

At the October 17, 2017 suppression hearing, the government presented testimony from Virginia State Trooper Christopher Page. He testified to the following:

---

[1] There are multiple individuals involved in this case with the last name of "Jones." Accordingly, the court will refer to individuals with the last name "Jones" by their first name, including Jaymese Jones.

He was on duty on September 16, 2016, when he received a call from his supervisor that the FBI was conducting an interdiction involving a narcotics controlled purchase by individuals in a grey Nissan sedan, which was part of a broader drug and gang investigation. Page was told that he would need to assist either by providing surveillance of the car or by pulling it over. He followed the car in his own police vehicle as it went to a trailer park; after some time the car left and exited onto I-95 South. Page continued to follow the car and pulled the car over for following too close to the car in front of it. At some point, two other state troopers in unmarked vehicles pulled up behind Page's car.

Page activated an audio and video surveillance system on his police car while pulling the car over, which was played, in part, for the court. Once the car stopped, Page made contact with Jaymese, the driver of the vehicle, and Shonda, the passenger. He got both of their licenses and learned that the car belonged to Shonda. Page asked Jaymese to enter his patrol vehicle. He asked her where she was coming from, and she said that she had been to Virginia Beach to visit her boyfriend. She told him that she worked as a correctional officer in a state jail and that Shonda was her cousin. Page got out of the vehicle and went to see Shonda who was still in the passenger seat of her vehicle. Page asked Shonda where they had driven from; Shonda answered that they had come from Hopewell, Virginia. Page then went back to his patrol car and ran Jaymese's information through his computer. He returned her license and registration, said that she was "good to go," and that he was going to issue her a warning. Def. Ex. 1 at 5, ECF No. 936-1.

Before Jaymese left the car, Page asked her if he could ask her a few more questions, and she said "okay." He asked if she was involved in any type of illegal activity—either drug

2

or gun related—and she said "no." He asked if he could search the car, and she agreed. Jaymese got out of the car, and Page told her that he thought she was involved in illegal activity. He asked Shonda if she was related to Jaymese and Shonda said that they were not related and just friends. Jaymese and Shonda stood by the patrol car while Page searched Shonda's car; he did not find any contraband. He had a police dog in the back of his vehicle, which he walked around Shonda's car. The dog alerted to the odor of narcotics. Page sat Jaymese back in the passenger seat of the patrol car; he told her that the dog had alerted on the car and that he had "probable cause to hold you and the vehicle." Id. at 10. Page asked Jaymese if she had any contraband on her and she said no. Page told Jaymese that she could stay in the police vehicle or get out, but that she had to "hang tight for me, just don't go anywhere." Id. Jaymese asked if she could have her phone. Page told her "not yet." Id. at 11. Jaymese exited Page's vehicle and stood on the passenger side of it. The officers located narcotics in Shonda's shoe. Shonda asked whether she was under arrest. Page answered, "you are not under arrest, I'm just detaining you." Id. Shonda asked what Page meant and he said "We're still investigating. We'll be doing an investigation. Basically, you're not free to leave. . . . But you potentially could be." Id. Jaymese asked what was happening. Page explained that the officers had found drugs on Shonda and that an investigator was coming to talk to Shonda. About 35 minutes into the traffic stop, Jaymese asked how much longer the stop would take. Page answered that he was not sure how long "before you'll get out of here. It shouldn't be long." Id. at 16. Jaymese then asked Page what she was going to do with her dog, which was with her. He said that he did not know, he had never been in that

3

situation before, but the dog might have to go to an animal shelter if she were arrested. The traffic stop and ensuing investigation on the side of I-95 lasted about an hour.

Page and the other two officers were in contact with the FBI agents who were running the larger gang-related investigation. Once the FBI agents arrived at the scene, the officers decided that it would be better to relocate to a safer location somewhere off the highway. Page told Jaymese that they would be going to the parking lot behind Dance's Sporting Goods Store, which was off of the next exit where "very few people" go. Id. at 19. He told her to drive Shonda's car to the next exit: "Meet us up there, and don't go anywhere; don't do anything crazy." Id. By that, Page testified that he meant that Jaymese should not try to flee or start a pursuit because she was not free to leave at that time. Page remembered that Jaymese drove Shonda's car and Shonda was driven to the Dance's parking lot in one of the trooper's vehicles.

The cars caravanned to Dance's, with Page in the lead, then Jaymese driving Shonda's car, then the two state troopers, and finally the various FBI agents in their vehicles. Page parked his car next to a dumpster and strip of grass. Jaymese parked a few parking spaces away. The other troopers and agents parked their cars in parking spaces facing those cars across an alleyway. Once in the Dance's parking lot, Page did not play an active role in the questioning of either Jaymese or Shonda. Page stood outside of his vehicle or sat inside it for the rest of the encounter between Jaymese and law enforcement. Page remembered that at one point, either Jaymese or Shonda or both were escorted to a convenience store to use the restroom and to buy a drink.

The government also presented testimony from FBI Special Agent Stephen Duenas. He testified to the following:

On September 16, 2016, he was a case agent on an investigation into various members of the Mad Stone Bloods ("MSB") gang. He was involved in an interdiction plan in which a confidential informant had made arrangements for an MSB gang member to sell drugs and a firearm to Shonda. Shonda was then planning on bringing the contraband into the prison where she and Jaymese worked as correctional officers. Duenas' role was to obtain the funds for the drug purchase, conduct surveillance, and interview Shonda once she was apprehended. Duenas was monitoring the movement of Shonda's car and was ready to stop the car after it left the trailer park, but Jaymese drove the car in the opposite direction from where Duenas was located and where he anticipated they would go. Accordingly, Page, a state trooper, conducted the stop. Duenas was in contact with one of the state troopers who came to aid Page with the traffic stop. When Duenas arrived at the scene of the traffic stop, Shonda's vehicle had been stopped for approximately an hour on the side of I-95, and there were a total of three police vehicles parked behind her car.

Duenas made contact with Shonda, told her that the troopers had found contraband items on her, and that he wanted to talk to her further. Duenas said that the current location was unsafe, and that he wanted to go to a different location to conduct the talk. Shonda said that she would be willing to go to a different location. Duenas remembered that Jaymese and Shonda drove in Shonda's car to the Dance's parking lot location, following Page. The remaining four law enforcement vehicles followed behind Shonda's car. The officers parked their cars across an alley from Shonda's car and facing her car. Duenas remembered that

5

Shonda needed to go to the restroom and his recollection was that she drove by herself to a nearby restaurant to use the restroom and then returned. Shonda then accompanied Duenas into his police truck; she sat in the front passenger seat, Duenas sat in the driver's seat, and another FBI agent sat behind her with the doors and windows closed. Duenas informed Shonda of her Miranda rights and interrogated her for about an hour. During that time Jaymese was sitting in Shonda's car, with the car keys and her phone. Jaymese also drove to the bathroom at some point; although Duenas could not remember with certainty, he thought that Jaymese drove to the bathroom unaccompanied.

After interrogating Shonda, Duenas walked Shonda back to Shonda's car, and asked Jaymese if she would be willing to talk to him. Jaymese agreed and sat in the passenger seat of Duenas' truck, with Duenas again in the driver's seat and the same FBI agent seated behind. The doors and windows of the truck remained closed and no one entered or exited during the interview. Duenas began by telling Jaymese that "we've already got your information, ok, you understand that you are not in custody, ok, you know you can leave whenever you want." Def. Ex. 2 at 1, ECF No. 936-2. Jaymese responded, "I'm going to clear this before I leave, so you know I'm being honest." Id. Duenas replied, "But I just want to make sure you know that you're here, you can open that door and leave whenever you feel like it. You're under no burden, barrier, or responsibility to talk to us in any fashion at this point." Id. Jaymese responded, "Ok." Id.

Duenas then proceeded to interview Jayemse for approximately 46 minutes. During that time, additional officers in unmarked patrol cars arrived on the scene so that there were a total of eight cars and officers. Duenas told Jaymese that it was "an investigation" and that

6

if she lied, "[t]hen the world turns bad quick." Id. at 2. Later, Duenas said that if he thought Jaymese was lying, "then we start having an issue," and if he could prove that she was lying, "the world gets even worse for you." Id. at 12. He said that because Jaymese was driving the car and a large amount of drugs were found on Shonda, "it's not too hard, going from all of that, to build a case against either or both of you." Id. Duenas told Jaymese that he knew things about Shonda and the prison in which they worked, and that if Jaymese hid the truth, then "it makes me really, really, start to wonder. And you don't want me wondering, because my mind will go into a deep place. And that's not good for you." Id. at 13.

Following the interview, Duenas asked Jaymese if she would be willing to give him her phone for a few days in order for him to review the contents. He told her, "it's your choice, if you're willing, it would make me happy, if you're not, that's your choice." Id. at 22. She agreed to give Duenas her phone. Neither Jaymese nor Shonda were arrested that day. Duenas told Jaymese that she was going to be able to go home while he continued to investigate.

II.

Jaymese argues that the statements that she made to Duenas should be suppressed because he did not warn her—as he did Shonda—of her Miranda rights. However, because the court concludes that Jaymese was not in custody when she was questioned, suppression is unwarranted.

A. Valid Terry Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S.

7

Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10 (1996). An ordinary traffic stop effectuates "a limited seizure more like an investigative detention than a custodial arrest;" accordingly, to determine the limits of police conduct during a routine traffic stop, courts should apply the Supreme Court's analysis under Terry v. Ohio, 392 U.S. 1 (1968). United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011).

As the government conceded at the suppression hearing, this was not a routine traffic stop. Nonetheless, it started out that way and Jaymese does not argue that the initial stop was improper. She was stopped for a valid traffic reason. See United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) (observing that a traffic violation gives an officer probable cause to stop the driver); Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (noting that an officer may instigate a limited stop following a traffic violation in order to investigate that violation). After she was given a warning and her license and registration were returned, Page asked Jaymese if he could ask her a few more questions, and she agreed. United States v. Brugal, 209 F.3d 353, 358-59 (4th Cir. 2000) (noting that a reasonable suspicion that criminal activity is occurring based on a totality of the circumstances following a Terry stop permits further questioning). During the exchange, Jaymese consented to a search of Shonda's car, and Page searched it, without finding any contraband. Therefore, the Terry stop transformed into a consensual encounter. See United States v. Meikle, 407 F.3d 670, 673 (4th Cir. 2005) (noting that once a search becomes consensual, the Terry analysis does not apply).

8

Page took the police dog, which had been in the back of his vehicle, and walked it around Shonda's car. This was approximately twenty minutes into the traffic stop. The dog alerted to the odor of narcotics. Jaymese does not argue that Page lacked reasonable suspicion to conduct the drug dog sniff and the court concludes that reasonable suspicion, in fact, existed based on the conflicting stories that Jaymese and Shonda provided about where they had been and whether they were related, as well as Page's earlier surveillance of their car in conjunction with his knowledge of the larger drug and gang investigation that was ongoing. See United States v. Foreman, 369 F.3d 776, 784 (2004) (noting that a law enforcement officer had reasonable suspicion to conduct a drug dog sniff based, in part, on an unusual explanation of the suspect's travel plans and his driving route on a common illegal narcotics thoroughfare); United States v. Massenburg, 654 F.3d 480, 492 (2011) (noting that an officer can rely on the collective knowledge of other officers involved in an investigation to support probable cause). Following the drug dog sniff, narcotics were found in Shonda's shoe. Therefore, the officers were justified in continuing the investigation.

B. Custody Determination

Jaymese argues in her supplemental suppression motion that even if the traffic stop was proper, after the drug dog alerted on the car, and Page told Jaymese that she was not allowed to "go anywhere," she was "in custody" for Fifth Amendment purposes such that the officers were required to provide her with Miranda warnings. Moreover, in her original motion to suppress, Jaymese argues that at the very least, she was "in custody" when she was told to drive to Dance's parking lot because she was not free to leave, there were many law

9

enforcement officers and patrol vehicles present, the location was isolated and she had no independent means of transportation.

The Fifth Amendment protects a person from "be[ing] compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This constitutional protection requires that when a suspect is taken into custodial detention, law enforcement officers must inform the suspect of his or her various protections under Miranda before conducting an interrogation. United States v. Leshuk, 65 F.3d 1105, 1108 (4th Cir. 1995). Many interactions between police and individuals—even individuals suspected of criminal conduct—do not require that police review the Miranda safeguards with suspects. Miranda warnings are not necessary when a person is questioned during a routine traffic stop. A brief but complete restriction of liberty is valid under Terry. United State v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1993). Only when an investigatory detention turns into a custodial detention and interrogation, do concerns arise regarding a failure to provide Miranda warnings. United States v. Giddins, 858 F.3d 870, 879 (4th Cir. 2017).

A person is "in custody" for Miranda purposes when he is formally arrested or questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." Leshuk, 65 F.3d at 1108 (internal quotation marks omitted). To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation and determine how a reasonable person "in the defendant's position would have understood his [or her] situation." Id. (internal quotation marks omitted); see also Yarborough v. Alvarado, 541 U.S. 652, 663 (2004)

10

(noting that the custody inquiry requires the court to gauge the breadth of the suspect's freedom of action).

Two inquiries are essential to determining whether a defendant was in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Among the facts that a court should consider in making a custody determination are: (1) the time, place and purpose of the interaction; (2) the words used by the officer; (3) the officer's tone of voice and general demeanor; (4) the presence of numerous officers; (5) the potential display of a weapon by an officer; and (6) the potential physical contact between the officer and the defendant. United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010).[2] Any statements a suspect makes during custodial interrogation are inadmissible unless the defendant received Miranda warnings. Leshuk, 65 F.3d at 1108; see also Berkemer v. McCarty, 468 U.S. 420, 434, (1984) (noting that traffic stops generally do not result in custodial interactions and that Miranda warnings are not generally necessary).

1. Detention before Interview

It is true that Jaymese was told that she could not leave after the police dog alerted on Shonda's car. However, her detention lacks the "trapping of a formal arrest." United States v. Manbeck, 744 F.2d 360, 378 (4th Cir. 1984). She stood outside of the patrol car, while the officer's conducted the investigation. The drugs in Shonda's shoe were found

---

[2] There is no question that the approximately 46 minutes that Jaymese spent answering pointed questions by an FBI agent constituted an interrogation. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (concluding that when police engage in "either express questioning or its functional equivalent" an interrogation occurs). Therefore, the question of whether Duenas should have informed Jaymese of her Miranda rights turns on whether she was in custody.

11

approximately 26 minutes into the traffic stop. Jaymese asked Page if Shonda was arrested and Page said, "at this point, no." Def. Ex. 1 at 15, ECF No. 936-1. When Jaymese asked how long the search would take, Page replied, "I'm not sure how long now before y'all get outta here. It shouldn't be long." Id. at 16. The demeanor, tone, statements, and actions of the officers suggest that this was an ongoing investigation of Shonda but that Jaymese was not under arrest or its functional equivalent.

Once Duenas arrived, approximately 55 minutes into the traffic stop, the officers determined that the investigation needed to occur someplace safer than the side of the highway. See Florida v. Royer, 460 U.S. 491, 504 (1983) ("There are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention"). The evidence suggests that Jaymese's freedom was not curtailed to a degree associated with formal arrest even after she was directed to drive to Dance's. Berkemer, 468 U.S. at 440.

Although Jaymese was not free to drive off, she was permitted to drive to Dance's with her phone. For the first hour that she was in the Dance's parking lot, while Shonda was being interrogated, Jaymese sat, alone, in Shonda's car, with the keys. She had her phone with her and Duenas testified that she placed at least one call. She drove Shonda's car to a nearby restaurant or convenience store, either alone or accompanied by an officer, in order to use the restroom and/or buy something to drink. This level of freedom is not commensurate with the equivalent of a "restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotations omitted).

Moreover the factors that a court should consider in determining whether an individual was in custody weigh in favor of a finding that she was not. She was detained for a total of two hours before Duenas interviewed her; she sat in Shonda's car, with apparently no or very little contact with law enforcement officers. No one questioned her during this time. Accordingly, even assuming that she was "in custody," there was no need for her to receive Miranda warnings because she was not being interrogated. Rhode Island, 466 U.S. at 300 ([T]he Miranda safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent.").

2. Police Interview

After Duenas finished interrogating Shonda, he questioned Jaymese. The court concludes that this interaction did not rise to the level of a custodial detention. Even if the court were to assume that Jaymese had been in custody prior to her interview with Duenas, his interaction with her and the objective factors of the encounter establish that a reasonable person in Jaymese's position would have felt free to end the questioning and leave. See United States v. Wiggins, No 16-4402, 2017 WL 4005012, *2 (4th Cir. Sept. 12, 2017) (noting that there is not Fifth Amendment violation where the circumstances establish that a person "would have felt free to terminate the police questioning").

First, Duenas asked Jaymese if she would be willing to answer questions. She answered in the affirmative and accompanied Duenas to his vehicle. She was not put in the back of a patrol car or handcuffed, but instead sat in the passenger seat of the truck. See, e.g., United States v. Graves, 545 F. App'x 230, 237 (2013) (unpublished) (concluding that the fact that the defendant was questioned inside of a patrol car did not transform the

13

encounter into a custodial one). The interview took place in the middle of the day, behind a sporting goods store in a public parking lot. See United States v. Sullivan, 138 F.3d 126, 132 (4h Cir. 1998) (noting that the fact that the defendant was detained at midday in a public place, weighed in favor of a finding that he was not "in custody" for Fifth Amendment purposes). In addition, the questioning lasted only 45 minutes. Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (concluding that a half hour interview conducted in the police station, where the defendant was informed that he was not under arrest, did not constitute a custodial interrogation). Importantly, when Jaymese entered the truck, Duenas made clear that she was free to leave. He told her that she was "not in custody," could "leave whenever [she] want[ed]," and was "under no burden, barrier, or responsibility to talk." Def. Ex. 2 at 1, ECF No. 936-2. Jaymese responded that she was going to "clear this [up] before I leave, so you know I'm being honest." Id. While not dispositive, a statement that a suspect is not under arrest and is free to leave weighs in favor of a finding that he or she was not in custody. United States v. Hargrove, 625 F.3d 170, 180 (4th Cir. 2010).

Moreover, the fact that Duenas warned Jaymese that she would face serious consequences if she lied to him, does not render the encounter custodial. A law enforcement officer may make "statements about the potential consequences of making a false statement to law enforcement officers during an investigatory interview." United States v. Braxton, 112 F.3d 777, 782 (4th Cir. 1997). The video of the interview establishes that Duenas was very polite and professional while asking Jaymese questions. See Wiggins, 2017 WL 4005012, *2 (noting that the fact that the police never adopted an aggressive or authoritative tone or demeanor was one factor, among many, to consider in determining

14

whether a defendant was in custody). While there were a total of approximately eight officer and eight unmarked law enforcement vehicles in the Dance's parking lot, only two agents interviewed Jaymese and Duenas did most of the talking. United States v. Graves, 545 F. App'x 230, 237 (4th Cir. 2013) (unpublished) (concluding that an encounter with three law enforcement officers does not weigh in favor of a custody determination); Hargrave, 625 F.3d at 179 (concluding that that the defendant was not in custody when 10 to 15 law enforcement officers executed a search warrant on a defendant's apartment but only two were present to conduct the interview of the defendant in the defendant's kitchen). Finally, no officer drew or displayed his weapon, used aggressive behavior toward Jaymese or touched her in any way. Hargrove, 625 F.3d at 179. Accordingly, under the totality of the circumstances, a reasonable person in Jaymese's shoes would have felt that she was at liberty to terminate the questioning by Duenas at any time and leave. Keohane, 516 U.S. 99, 112 (1995).

### III.

For the reasons stated, the court will deny Jaymese Jones' motion to suppress with regard to the statements she made to law enforcement on September 16, 2016. An appropriate order will be entered this day.

**ENTER:** This 27th day of October, 2017.

*/s/ Michael F. Urbanski*

Chief United States District Judge